Filed 4/14/14  P. v. Tulloss CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B249989 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA054302) |
| v. | |
| GERARD TULLOSS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Walgren, Judge.  Affirmed and modified with directions.

Salerno and Associates, Anthony V. Salerno, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Stephanie C. Santoro, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Gerard Tulloss in counts 1 and 10 of lewd act upon a child (Pen. Code § 288, subd. (c)(1)),[1] in count 2 of sodomy of a person under the age of 16 (§ 286, subd. (b)(2)), in counts 3 and 11 of oral copulation of a person under the age of 16 (§ 288a, subd. (b)(2)), in counts 4-9 of lewd act upon a child (§ 288, subd. (a)), and in count 12 of continuous sexual abuse (§ 288.5, subd. (a)).  The trial court sentenced defendant to 29 years four months in prison, consisting of the upper term of 16 years in count 12, consecutive sentences of 8 months as to counts 1 and 10, and consecutive sentences of 2 years as to counts 4-9.  Consecutive terms of 8 months on counts 2, 3 and 11 were imposed but stayed pursuant to section 654.

Defendant contends that: (1)  there is insufficient evidence to support his convictions and the trial court erred in denying his motion for judgment of acquittal; (2) the trial court erred in denying his motion for new trial; (3)  he was denied access to social services reports in violation of his state and federal right to due process; and (4) the trial court abused its discretion in imposing the upper term as to count 12 and in ordering consecutive sentences.  The Attorney General contends that the abstract of judgment does not properly reflect the trial court's pronouncement of assessments imposed at sentencing.

We direct the trial court to prepare a corrected abstract of judgment to properly reflect its oral pronouncement imposing a $480 court operation assessment and a $360 criminal conviction assessment.  In all other respects, the judgment is affirmed.

**FACTS**

*Prosecution*

The two victims in this case are sisters P. and Hope.  At the time of trial, the sisters were 21 years old and 15 years old, respectively.  There were nine children in P.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

and Hope's family, including seven girls and two boys.  The girls' parents, Cynthia R. and Roger T., fought frequently, and separated when P. was 10 years old.  After the separation, the children lived with their father and visited their mother on weekends.  The Department of Children and Family Services (Department) and the court intervened on behalf of the children numerous times, beginning in 1992, and continuing through 2011.

**Offenses Against P. T.**

Defendant met P. in 2005, when she was 14 years old and a freshman in high school.  Defendant was 26 years old at the time and knew that P. was only 14.  Defendant would pick P. up from school and take her back to his apartment, where he gave P. marijuana and alcohol.   Defendant told P. that he liked her.  Within a few months, defendant kissed P.  He wanted P. to have sex with him because it was her first time.  They had sex at defendant's apartment.  From the time P. was 14 to 16 years old, they engaged in intercourse and oral copulation three to five times a week.  They had anal sex once when P. was 15 years old.

P.'s father was not initially aware that she was spending time with defendant. He met defendant when defendant dropped P. off after school one day.  P.'s father was immediately suspicious because defendant was considerably older than P.  He forbade defendant from seeing her.  P. rebelled by moving to her mother's house.

In 2006, P.'s father obtained a court order allowing P. to live with her mother, on the condition that P. stayed away from defendant.  P.'s father also obtained a restraining order against defendant and reported their sexual activities to the Department.  P. went to live with her mother in late 2006.

P. shared a bedroom with three beds with her six sisters at her mother's house. P. lived with her mother and her mother's boyfriend, and Hope and the other siblings lived with them every other weekend.  P. continued to meet with social workers while she lived with her mother.  She did not have any medical exams.

Defendant had a long distance truck driving job which took him out of state regularly, but he frequently stayed overnight with P. at her mother's house on the weekends when he was in town, sleeping either with P. in her bedroom or on the couch. Defendant brought alcohol and marijuana for P.'s mother, and brought gifts and groceries for the children. Defendant said he wanted to help P.'s mother. He disparaged P.'s father. P. believed defendant was very manipulative.

Defendant and P. had sexual intercourse and engaged in oral copulation in the bedroom, living room, and garage of her mother's house. P.'s mother caught them having sex in the bedroom twice. They continued to have sex frequently until P. was 18 years old, when her mother lost child visitation rights. P. continued to have a relationship with defendant. She traveled with defendant on his cross country truck drives. Defendant impregnated P. during one of their trips. P. did not receive any child support from defendant after their son was born.

P. discovered defendant was cheating on her in January of 2011. She did not report defendant to the police until after Hope made allegations of molestation against defendant during a doctor's appointment in August or September of 2011.

**Offenses Against Hope T.**

Hope was eight years old when defendant began dating P. She lived with her father and visited her mother every other weekend, where she slept in the same room as P. and their sisters. Defendant spent the night at her mother's house on weekends. Her mother drank large amounts of alcohol. Defendant would bring her mother alcohol and marijuana when he visited. He brought stuffed animals, candy and chips for the kids.

Hope was eight years old when defendant first molested her. He kissed her on the lips at her mother's house. He continued to molest Hope until she was 12 years old, kissing her and touching her body. Defendant touched Hope's breasts and vagina, both over and underneath her clothing, and put his finger inside her vagina. Defendant had sexual intercourse with Hope for the first time when she was nine years old. He came

4

into the girls' bedroom, got into Hope's bed, removed her clothes and his own, and put his penis in her vagina. Hope was "kind of" scared, so she did not say anything. Her sisters were in the bedroom at the time.

After the first incident, defendant began taking Hope into the living room to have sexual intercourse with her. He would wake her up and lead her to the couch. The abuse occurred regularly when Hope visited her mother. Defendant warned Hope not to tell anyone about the abuse because her mother and P. would get in trouble. Hope did not tell anyone because she did not want to stop seeing her mother and did not want to get her in trouble. Defendant told Hope she was pretty, that he loved her, and she was his "favorite."

When Hope was between eight and eleven years old, defendant asked her to write him a letter similar to the notes P. wrote him while he was traveling. The letter had "I love you," spelled out on it in hearts, and was signed, "Love Hope." Hope also wrote, "P.S. I am sorry you are alone and sometimes tired and sometimes hungry." Hope did not put defendant's name on the letter because she did not want her father to know that she was writing to him.

Defendant stopped molesting Hope after her mother lost child visitation rights. Hope went to the pediatrician's office for a routine checkup in August 2011. The doctor asked Hope general questions regarding her medical history. Hope was very anxious and nervous. When the doctor asked if she was sexually active, Hope began crying. The doctor asked if anything had happened to her, and Hope confided that defendant had molested her. The doctor reported the abuse to the Los Angeles Sheriff's Department (LASD). She did not conduct a physical examination out of concern for Hope's mental health.

Both a neighbor and the girls' brother testified that defendant was often at the house on the weekends when the children visited their mother. Hope's mother first introduced defendant to the neighbor as her friend.

Hope's brother believed that defendant favored Hope. He brought her gifts, was nice to her, and hugged her. On one occasion when Hope was about nine or ten years

5

old, her brother went to the kitchen in the middle of the night, and saw defendant lying on the couch with Hope. The television was turned off.

**The Investigation**

LASD Sergeant Michael Becker interviewed P. and Hope. Sergeant Becker investigated child abuse allegations as part of the Special Victims Bureau. He had been with LASD for 38 years, served in the Special Victims Bureau for 17 years and investigated almost 1,000 child sexual abuse cases. He had interviewed many young girls between the ages of eight and twelve years old.

Sergeant Becker described P. as more mature, vocal, and confident. She accepted more responsibility for the molestation. Hope was less mature, more timid, and ashamed. She cried uncontrollably during the interview, put her head down and had trouble making eye contact. She also spoke very softly. Sergeant Becker testified that it was common for girls of Hope's age reporting molestation to be timid and try to forget specific details of the abuse. He estimated approximately 25 percent of child sex abuse cases involve false allegations. In his experience, if an incident occurred within 96 hours of an investigation, a medical examination was ordered, but if a greater time had elapsed, it would be less likely that the child would be medically examined.

As part of the investigation, P. initiated a recorded phone call with defendant, which was played for the jury at trial. In the call, P. asked defendant to reminisce about their relationship. Defendant said that he often talked to others about P. and how she was the one that "showed [him] what love really was." He recalled that they first met during Christmas break of 2005 or 2006 when P. was 14 years old and a freshman in high school. P. asked if he remembered the time they went to the beach and then went to dinner at P.F. Chang's restaurant.[2] Defendant said they went to dinner, kissed at the

_____

[2]     P. testified that was the night she and defendant had sex for the first time. She was 14 years old.

6

beach, and then went home. He remembered P. was in the ninth grade the first time he kissed her. It was "the very first time [he] loved [her]." When P. asked him what happened at his apartment that night, he asked why she was asking so many questions.

Defendant confirmed that he stayed with P. at her mother's house when he was not working, and that P.'s mother had walked in on them while they were having sex and holding each other. He admitted he brought P.'s mother cigarettes and beer so she would let him see P.

P. said defendant and Hope were very close. Defendant responded that Hope looked like a younger version of P., because they had the same hair color and eyes. P. said that Hope was always defendant's favorite and that he gave her "all the good stuff." Defendant explained that he did that as an incentive to the other children.

Defendant reminisced that he and P. had been together seven years and had been through a lot together. He talked about asking P. to marry him six years earlier. Defendant said he was "escaping from a lot of problems" when he was dating P., and he "saw something that [he] liked," and it made him "feel very good." He remembered that when he and P. were on his trucking trips, they visited every state and made love in every state. Defendant told P. that she was his best friend and that he wanted to be with her and their son as a family. He said she could ask him anything and he would tell the truth. P. asked if he had sex with Hope. Defendant said, "No. No, no. This is what it is. Okay. I was there for her in a different way. But, that would have been for her ***. I never had any shit like that with her. Do you understand what I'm saying? Do you think I'm that fucking retarded?" He denied having sex with Hope, but said he showed her a picture of "the 69."[3] Defendant said there was "nothing going on" between him and Hope. He loved Hope because when P. was angry with him he could cry to her and she would console him. He would ask Hope for advice. P. said Hope told her defendant took her

_____

[3]     P. testified that defendant was referring to a picture of himself and another woman in a sexual position, which he had on his cell phone. Hope was eight years old at the time defendant showed her the picture.

into the living room while P. was sleeping to have sex. Defendant claimed they were in the living room watching television.

Defendant said he and Hope were close. He used to tell her he loved her and he "always made her feel good." He and Hope shared confidences. She would tell him who she liked at school. He was overprotective of Hope because she meant so much to him, and he loved her like a little sister.

P. insisted that she had never known Hope to lie and did not understand why she would lie about defendant. Defendant said maybe Hope had a crush on him. He said he respected Hope because she helped him through a lot. P. said that Hope described specific things about his genital area. Defendant denied that Hope had ever seen his genital area and when P. asked him again he answered, "Oh, my God. Are you fucking serious?"

The call ended when P.'s cell phone battery ran out of charge.

*Defense*

Kellie Pimienta, a social worker for the Department, testified that the Department became involved with P. and Hope's family in 1992. Numerous child abuse and neglect allegations were made between that time and 2009, six of which were substantiated. A social worker would have interviewed the entire family during the investigations. P. was the subject of a Suspected Child Abuse Report ("SCAR") prepared in July 2009, and a separate SCAR report was prepared in September 2011 that pertained to Hope. The 2009 report contained allegations of abuse against the girls' mother. The 2011 report concerned sexual abuse allegations against defendant. The Department conducted a full investigation and concluded that the allegations were substantiated.

Carmen Rita Moran employed defendant at her long haul trucking company from 2006 until 2010. In 2010, defendant introduced P. to Moran and asked if he could bring her on a drive with him. Moran requested identification because P. appeared to be underage. She denied defendant's request because her company did not carry rider's

8

insurance to insure passengers. Moran testified that defendant had a few days off between long distance trips. Defendant did not work for Moran between September 27, 2007, and May 6, 2008.

## DISCUSSION

### *Denial of Motion for Judgment of Acquittal*

After the prosecution completed presentation of its case in chief, defense counsel moved for judgment of acquittal under section 1118.1 on the ground that there was insufficient evidence to support the charged offenses.[4] Defendant challenges the trial court's denial of the motion, and challenges the sufficiency of the evidence supporting his convictions on constitutional grounds. Neither argument has merit.

We independently review the sufficiency of the evidence supporting a conviction. (*People v. Cole* (2004) 33 Cal.4th 1158, 1213 (*Cole*).) "In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*Cole*, *supra*, at p. 1212.) "'"[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier

---

[4]     Section 1118.1 provides: "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

9

of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."' [Citation.] 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt."' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66 (*Snow*).)

Our review of the trial court's denial of a motion for judgment of acquittal under section 1118.1 is also independent. (*Cole*, *supra*, 33 Cal.4th at p. 1212.) "In ruling on a motion for judgment of acquittal pursuant to section 1118.1, a trial court applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction, that is, "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." [Citations.]' [Citation.] 'Where the section 1118.1 motion is made at the close of the prosecution's case-in-chief, the sufficiency of the evidence is tested as it stood at that point.' [Citation.]" (*Cole*, *supra*, at pp. 1212-1213.) The question is "whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination [at the point when the motion is made]." (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1024.) We evaluate the evidence in the light most favorable to the prosecution. (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 132.)

Defendant was charged in counts 1 and 10 with committing lewd or lascivious acts on a child against P. (§ 288, subd. (c)(1).) Section 288, subdivision (c)(1) prohibits the commission of a lewd act on a child 14 or 15 years of age by a person at least 10 years older. Conviction requires proof that the accused "willfully and lewdly commit[ed] any lewd or lascivious act . . . upon or with the body, or any part or member thereof . . . with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child. . ." (§ 288, subd. (a).) Defendant does not contest that he is at least 10 years older than P., but contends that proof of the remaining elements was

provided solely through P.'s testimony, which he claims is not a sufficient basis for conviction.

Defendant ignores the settled rule of law that "[t]he uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable." (*People v. Scott* (1978) 21 Cal.3d 284, 296.) Instead, he argues that P.'s testimony was "wholly uncorroborated." The extent to which P.'s testimony was corroborated goes only to its weight, however, and the weight of the evidence is a determination left to the jury. (*Snow*, *supra*, 30 Cal.4th at p. 66.) Moreover, P.'s testimony that she was 14 years old at the time she and defendant first had sex, he wanted to have sex with her because it was her first time, and they thereafter engaged in intercourse and other sexual acts multiple times each week is not uncorroborated. In the recorded phone call with P., defendant admitted that he met and kissed her when she was 14 years old and said that it was "the very first time [he] loved [her]." He went on to talk about how her mother caught them having sex in her house, and how he assuaged P.'s mother with gifts of alcohol and cigarettes. Hope's testimony also provided circumstantial evidence supporting the verdicts. She testified that defendant was dating P. and spent the night in the girls' room and on the couch of her mother's house on weekends.

P.'s testimony is also sufficient to support the conviction in count 2 of sodomy on a person under 16 years of age (§ 286, subd. (b)(2)), and the convictions in counts 3 and 11 of oral copulation on a person under 16 years of age (§ 288a, subd. (b)(2)). Section 286, subdivision (b)(2) prohibits persons over the age of 21 from participating in an act of sodomy with a person under the age of 16. Sodomy is defined as sexual contact between the penis of one person and the anus of another person. (§ 286, subd. (a).) P. testified that she and defendant engaged in one act of anal sex when she was 15 years old. Section 288a, subdivision (b)(2) prohibits persons over the age of 21 from participating in an act of oral copulation with a person under the age of 16. Oral copulation is copulation of the mouth of one person with the sexual organs or anus of another person. P. testified that she and defendant engaged in oral sex between three and five times a week from the time

11

she was 14 to 16 years old. Thus, substantial evidence supports all five convictions for the offenses against P.

Defendant was also convicted in counts 4-9 of lewd act upon a child (§ 288, subd. (a)) and in count 12 of continuous sexual abuse (§ 288.5, subd. (a)), against Hope. Section 288, subdivision (a) punishes lewd acts committed on a child under 14 years of age. Conviction requires proof that the accused "willfully and lewdly commit[ed] any lewd or lascivious act . . . upon or with the body, or any part or member thereof . . . with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child. . ." (§ 288, subd. (a).) It is uncontested that Hope was under 14 years old at the time of the incidents. Hope testified that defendant kissed her on the lips when she was eight years old, touched her breasts and vagina, and put his finger inside her vagina. She testified that defendant had intercourse with her when she was nine years old, and continued to have intercourse with her on a regular basis until she was eleven years old. Hope described defendant coming into her bedroom at night and leading her to the living room couch to have sex. Hope's brother's testimony that he saw defendant and Hope lying on the couch together in the middle of the night with the television off both corroborated her story and rebutted defendant's statement in the recorded phone call that he and Hope went into the living room to watch television.

Defendant's intent with respect to the lewd acts against Hope may be inferred by the nature of the charged acts, the close relationship he shared with Hope, his gifts and favoritism of her, his gifts of alcohol to Hope's mother, Hope's testimony that defendant told her not to report the molestation because her sister and mother would get into trouble, and the clandestine nature of the incidents, which took place in the middle of the night on the couch away from Hope's sisters. (See *In re Jerry M.* (1997) 59 Cal.App.4th 289, 299 ["Circumstances which have been considered relevant to proving intent to satisfy sexual desires include: the charged act, extrajudicial statements, the relationship of the parties, other acts of lewd conduct, coercion or deceit used to obtain the victim's cooperation, attempts to avoid detection, offering of a reward for cooperation, a stealthy

12

approach to the victim, admonishment of the victim not to disclose the occurrence, physical evidence of sexual arousal and clandestine meetings."].)

Finally, defendant was convicted in count 12 of continuous sexual abuse pursuant to section 288.5, subdivision (a), which provides that "[a]ny person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066, or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child. . ." "Regular access" has no technical meaning beyond the common understanding of it as "an ongoing ability to approach and contact someone time after time." (*People v. Rodriguez* (2002) 28 Cal.4th 543, 547.)

Hope testified to the substantial sexual conduct defendant had with her when she was under the age of 14. He touched her breasts and vagina and digitally penetrated her when she was eight years old, and had intercourse with her starting at the age of nine. She also testified as to the duration of the molestation, which lasted for approximately four years, from the time she was eight until she was eleven years old. Hope and P.'s testimony also support the jury's conclusion that defendant had regular access to Hope. Hope spent weekends with her mother. Both girls testified that defendant often spent the night at their mother's house on weekends. In the recorded phone call, P. discussed that defendant often spent time with Hope. Defendant did not deny that he spent significant time with Hope, but explained that they had a close relationship and shared things that they did not tell other people. It can be inferred from their close relationship that defendant and Hope saw each other on a regular basis.

*Denial of Motion for New Trial*

Following the verdicts, the defense filed a motion for new trial pursuant to section 1181(6). Defendant argued, in relevant part, that the verdict was contrary to the law or evidence because it was not supported by substantial evidence. The trial court denied the motion, stating, "The court feels that the evidence was overwhelming. It was corroborated in that the jury's verdict was a sound, fair, and just verdict based on the evidence presented." We agree with the trial court's assessment.

Section 1181 allows a trial court to grant a new trial when a jury verdict is "contrary to law or evidence." (§ 1181 (6) and (7).) "The court extends no evidentiary deference in ruling on a section 1181(6) motion for a new trial. Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a '13th juror.'" (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) "If the court is not convinced that the charges have been proven beyond a reasonable doubt, it may rule that the jury's verdict is 'contrary to the . . . evidence.'" (*Ibid*.; § 1181(6).) "In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal. Thus, the grant of a section 1181(6) motion is the equivalent of a mistrial caused by a hung jury." (*Ibid*.)

Overwhelming evidence supports the verdicts in this case. Based on the evidence detailed above, the trial court did not err in denying the motion for new trial. We are convinced of defendant's guilt as to all charges beyond a reasonable doubt.

*Nondisclosure of Department of Children and Family Services Reports*

Defendant contends his right to due process was violated by the prosecution's failure to disclose material evidence – specifically, the 2009 SCAR report pertaining to P. and "what must have been numerous" SCAR reports generated by the Department.

Prior to trial, the defense filed a request with the Department for all records pertaining to P. and Hope. Defense counsel received a 2011 SCAR report concerning

14

defendant's alleged sexual abuse of Hope, and some sheriff's reports. At trial, the prosecution produced the 2009 SCAR report when it cross-examined the social worker called by the defense. The prosecutor stated that he was making a copy of the 2009 SCAR report for the defense because defense counsel did not believe he had a copy of the 2009 report. Upon questioning, the social worker testified she had not prepared the report, but had referenced it in preparing the 2011 SCAR report. On redirect examination by the defense, the social worker confirmed that the 2009 SCAR report concerned the girls' mother's alleged abuse of P. The report referenced "a boyfriend," but contained no allegations of sexual abuse. Defense counsel did not object or request a continuance at the close of questioning.

In his motion for new trial, defendant argued that his right to due process was violated because the Department only produced the 2011 SCAR report, and did not produce the 2009 SCAR report or any other reports that may have been made, thus preventing him from discovering potential witnesses or impeaching prosecution witnesses. The prosecutor explained that he believed the previously-assigned prosecutor had turned over SCAR reports, which the Department had produced to both parties pursuant to the defense's subpoena. The prosecutor had given the defense an unredacted version of the 2009 SCAR report during cross-examination when it became apparent that the defense did not have a copy. The prosecutor further explained that the Department generally would not turn over reports that did not contain exculpatory information, and that the 2009 SCAR report was such a report. Defense counsel emphasized that he was not alleging a discovery violation on the part of the prosecution, but was instead arguing that defendant's due process rights were violated by the Department's failure to provide all reports.

The court ruled: "As to the due process claim, the defense is not raising an issue of not being provided discovery. They are raising an issue of the dependency court essentially not ordering that the SCAR reports be released to the defense when in some manner they were released to the People. However, that was handled or transpired procedurally. I don't have all the details before me, nor is it necessarily of great concern

15

to this court. [¶] The fact is the discovery was provided and the fact that the defense disagrees with the dependency court's ruling on that issue is not something I'm going to entertain at this time. I do feel based on everything before me, there was no due process violation; that the defense had the discovery . . . ."

Due process requires the prosecution to disclose exculpatory material evidence to the accused. (*Brady v. Maryland* (1963) 373 U.S. 83; *People v. Jenkins* (2000) 22 Cal.4th 900, 954 (*Jenkins*).) Evidence is material if a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense. (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 57; *Jenkins*, *supra*, at pp. 952, 954.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." (*Jenkins*, *supra*, at p. 954.) A prosecutor's duty under *Brady* [*v. Maryland* (1963) 373 U.S. 83] to disclose material exculpatory evidence extends to evidence the prosecutor—or the prosecution team—knowingly possesses or has the right to possess. The prosecution team includes both investigative and prosecutorial agencies and personnel. (See *In re Brown* (1998) 17 Cal.4th 873, 879.)

Preliminarily, we agree with the prosecution that defendant forfeited his contention by failing to raise the specific issue below. The defense was aware that the prosecution possessed the 2009 SCAR report during the trial, but did not object to its failure to disclose the report at an earlier juncture, request sanctions for the alleged discovery violation, or seek a continuance, thus forfeiting the contention on appeal. (See *People v. Morrison* (2004) 34 Cal.4th 698, 714; *People v. Carpenter* (1997) 15 Cal.4th 312, 411.)

Moreover, the duty to disclose extends only to exculpatory evidence. With respect to the 2009 SCAR report, it came into the defense's possession during trial. The defense had the opportunity to review it, and yet does not point to any information contained in the report that might benefit defendant's case or hurt the prosecution's. Defendant's assertion that "there had been a previous investigation into Gerard and P.'s relationship in

16

which Gerard was cleared of misconduct," finds no support in the record.[5]  Although the social worker mentioned that there was reference to "a boyfriend" in the 2009 SCAR report , the report was an investigation of abuse by P.'s mother, not an investigation of defendant.  It contained no allegations of sexual abuse, nor did it clear anyone of sexual misconduct.  It is not clear from the testimony that the boyfriend referenced was defendant and not the mother's boyfriend, who lived with the family at that time, or someone else entirely.  Having failed to show that the outcome of the case might have been affected had the 2009 SCAR report been disclosed earlier, defendant cannot establish that the prosecution acted in violation of his right to due process by failing to disclose it.

With respect to the supposed "numerous" reports that "must have" been generated by the Department during its long-term involvement with the victims' family, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*U.S. v. Agurs* (1976) 427 U.S. 97, 109-110.)  The duty of disclosure under *Brady* "must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor"—evidence that is "clearly supportive of a claim of innocence." (*Id*. at p. 107.)  In this case, the defense points to vague reports that may or may not have existed or been in the prosecution's possession.  The prosecution's duty does not extend to evidence that could be discovered with due diligence. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1134, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  Defendant subpoenaed all reports relating to the victims from the Department.  If there "must have" been more reports this was surely apparent at the time the 2009 SCAR report was received, yet it appears that no further efforts were made to obtain the alleged reports from the Department or to challenge the juvenile court's ruling on the scope of disclosure.  The prosecution has no

---

[5]     The 2009 SCAR report is not contained in the record on appeal.  All information with respect to the report is derived from the reporter's transcript of the social worker's testimony.

17

duty to conduct the defendant's investigation for him, which is essentially what defendant argues here. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1048-1049.)

In sum, even if defendant had not forfeited the issue, he has failed to demonstrate the suppression of material evidence such that a reasonable probability exists that a different result would have occurred in the proceeding had the evidence been disclosed to the defense prior to trial. (See *Pennsylvania v. Ritchie*, *supra*, 480 U.S. at p. 57; *Jenkins*, *supra*, 22 Cal.4th at pp. 952, 954.)

*Sentencing Issues*

Defendant contends that the trial court's imposition of the upper term of 16 years on count 12 for continuous sexual abuse of Hope (§ 288.5, subd. (a)), and the imposition of consecutive sentences on the remaining counts, were an abuse of discretion. We reject these contentions.

The trial court has discretion to impose either the lower, middle, or upper term, but must set forth the reasons for its decision on the record. (§ 1170, subd. (b).) "In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, . . . and statements in aggravation or mitigation. . . ." (§ 1170, subd. (b).) " 'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in qualitative as well as quantitative terms.' [Citation.] One factor alone may warrant imposition of the upper term [citation] and the trial court need not state reasons for minimizing or disregarding circumstances in mitigation [citation]." (*People v. Lamb* (1988) 206 Cal.App.3d 397, 401.) The burden is on the party challenging the decision to clearly show the sentencing decision was irrational or arbitrary. (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.) We review the trial court's sentencing decisions for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

In this case, the trial court set forth numerous factors in aggravation including the high degree of callousness, the vulnerability of the victim, the "sophistication and

18

planning that needs to go into this type of offense where victims that are particularly vulnerable due to any range of circumstances are sought out to be exploited and manipulated," and defendant's position of trust with the family. The trial court also relied on the fact that defendant was a grown man and significantly older than the victim, and that he had strong family support at the time of the crime, yet committed the offense nonetheless. The court found the fact that defendant had a minimal criminal record to be a mitigating factor.

Defendant's argument that these aggravating factors were an improper basis for imposing the upper sentence is unavailing. The cited aggravating circumstances are all legitimate factors that courts may consider. California Rules of Court, rule 4.420 (a) specifically lists several of the factors the trial court relied on as relevant to the court's sentencing decision. (Cal. Rules of Court, Rule 4.421(a)(1) [high degree of callousness]; (a)(3) [victim's vulnerability]; (a)(8) [manner in which offense was carried out indicates a high level of planning and sophistication]; and (a)(11) [taking advantage of a position of trust].) While defendant is correct that "[a] fact that is an element of the crime upon which punishment is being imposed may not be used to impose a greater term [under California Rules of Court, rule 4.420(d)]," the factors in aggravation considered here are not elements of continuous child abuse under section 288.5. In pertinent part, section 288.5 subdivision (a) states that "[a]ny person who . . . has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066 or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child . . . ."

"[A]ggravating a sentence due to "particular vulnerability," where vulnerability is based *solely* on age, is improper when age is an element of the offense. [Citations.] However, 'particular vulnerability' is determined in light of the 'total milieu in which the commission of the crime occurred. . . .' [Citation.]" (*People v. Dancer* (1996) 45

19

Cal.App.4th 1677, 1693-1694, overruled on another ground in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.) Here, Hope was particularly vulnerable due to the fact that she was a child of a broken home, whose mother had a serious drinking problem, as well as being very young, so her vulnerability is a proper consideration. Although Hope's age is an element of the offense, the perpetrator's age is not. Defendant could be found guilty regardless of his age, and the court could conclude that his culpability was greater as a full grown adult who had the maturity to understand the wrongness of his actions. Similarly, it was not necessary to defendant's guilt that he display callousness, plan the offenses with sophistication, or be in a position of trust. Defendant evidenced no remorse for his actions. He planned the abuse by providing Hope's troubled mother with alcohol and marijuana, and taking Hope to the living room, away from her siblings in the middle of the night, to abuse her. He could have had continuous access to Hope without being in a position of trust, but he bolstered her trust of him by bringing her special gifts, telling her he loved her, and sharing confidences with her. Nor was the trial court wrong in determining that defendant's strong family support was an aggravating rather than a mitigating circumstance. As with his age, his family support should have placed defendant in a better position to curb his actions. Despite security in his own personal life, he chose to prey upon a small child. The trial court did not abuse its discretion in concluding that all of these considerations made the offense sufficiently aggravated to warrant the upper term sentence.

The trial court also has discretion to impose either concurrent or consecutive sentences. (§ 669.) When deciding whether to impose consecutive or concurrent sentences, the trial court considers whether the crimes and their objectives were predominantly independent of each other, whether the crimes involved separate acts of violence, whether the crimes were committed at different times or separate places, and any aggravating or mitigating circumstances. (Cal. Rules of Court, rule 4.425.) Here, the court found that: "consecutive sentences [were] appropriate. . . as these crimes were committed on separate dates with separate acts. They were independent of one another and extended over a period of four years." We conclude that the court properly took into

20

account the relevant considerations and did not abuse its discretion in imposing consecutive sentences.

### *Court Operation and Criminal Conviction Assessments*

At sentencing, the trial court imposed a $40 court operations assessment and a $30 criminal conviction assessment as to each of the twelve counts. The abstract of judgment incorrectly reverses the total amounts of the imposed assessments, reflecting a court operations assessment of $360, and a criminal conviction assessment of $480. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) We therefore order that the abstract of judgment be corrected to properly reflect the court's pronouncement imposing a court operations assessment totaling $480, and a criminal conviction assessment totaling $360.

## DISPOSITION

The trial court is directed to prepare a corrected abstract of judgment to properly reflect its oral pronouncement imposing  a $480 court operation assessment and a $360 criminal conviction assessment.  The trial court shall forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

MINK. J. *

---

*      Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.